MARIO N. ALIOTO, ESQ. (56433)
LAUREN C. RUSSELL, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
malioto@tatp.com
laurenrussell@tatp.com

JOSEPH M. PATANE, ESQ. (72202)
LAW OFFICES OF JOSEPH M. PATANE
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
E-mail: jpatane@tatp.com

Attorneys for Plaintiff
[*Additional Attorneys Appear on Signature Page*]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT LAMSON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>THE HERSHEY COMPANY; MARS INC.; MASTERFOODS U.S.A., INC.; NESTLE S.A.; NESTLE U.S.A., INC.; and CADBURY SCHWEPPES PLC,<br><br>Defendants. | Case No. 08 0153<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1
CLASS ACTION COMPLAINT

# CLASS ACTION COMPLAINT

Plaintiff Scott Lamson ("Lamson") on behalf of himself and all others similarly situated in the United States, brings this action for treble damages and injunctive relief under the federal antitrust laws of the United States against the Defendants named herein, demanding trial by jury, and complaining and alleging as follows:

## NATURE OF THE CASE

1. This lawsuit is brought as a class action on behalf of individuals and entities that purchased chocolate (as further defined below) in the United States directly from Defendants, their predecessors, or their controlled subsidiaries and affiliates during the period beginning no later than February 2002 and continuing through the present (the "Class Period"). Plaintiff alleges that during the Class Period the Defendants conspired to fix, raise, maintain or stabilize the prices of chocolate sold in the United States. As a result of Defendants' unlawful conduct, Plaintiff and the Class Members paid artificially inflated prices for chocolate and have suffered antitrust injury to their business or property.

2. At all relevant times herein, Defendants were chocolate manufacturers that manufactured, marketed, sold, and/or distributed chocolate to customers in the United States and throughout the world.

3. Plaintiff alleges that Defendants' cartel and concerted anticompetitive conduct is a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits restraints of trade. Plaintiff seeks treble damages and injunctive relief on behalf of himself and all other similarly situated purchasers of chocolate during the Class Period.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action based on Section 4 of the Clayton Act, 15 U.S.C. §15, which confers to the United States district courts jurisdiction over actions seeking damages and costs, including reasonable attorneys' fees, for violations of the Sherman Act. Section 16 of the Clayton Act, 15 U.S.C. §16, is the basis for this Court's jurisdiction over Plaintiff's claim for injunctive relief. This Court also has jurisdiction under 28

CLASS ACTION COMPLAINT

1 U.S.C. §1331, which vests the district courts with jurisdiction over actions, such as this one, which arise under federal law, and under 28 U.S.C. §1337, which grants the district courts jurisdiction under the federal antitrust laws.

5. This Court has personal jurisdiction over Defendants because they systematically and continually conduct business in the United States, including marketing, advertising, and sales directed to residents here.

6. Venue is laid in this District pursuant to 28 U.S.C. § 1391. Venue is proper in this judicial district because during the Class Period one or more of the Defendants resided, transacted business, was found, or had agents in, this district, and because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, and a substantial portion of the affected portion of the interstate trade and commerce described below has been carried out in this district.

## DEFINITIONS

7. Chocolate is a confectionary product created by processing cocoa beans and mixing the processed beans with milk, sugar, and other ingredients. As used in this Complaint, the term "Chocolate" shall include, at least, chocolate bars, industrial chocolate (melted and powdered chocolate made after processing cocoa beans sold to create a final product), and block chocolate (solid chocolate blocks made for immediate consumption and for melting down to make desserts and molded chocolate products).

8. The "Class Period" or "relevant period" means the period from no later than February 2002 and continuing through the present.

9. "Person" means any individual, partnership, corporation, association, or other business or legal entity.

## PLAINTIFF

10. Plaintiff Scott Lamson ("Lamson") is a California resident. During the relevant period, Lamson purchased Chocolate directly from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

//

## DEFENDANTS

11. Defendant The Hershey Company ("Hershey's") is a Delaware corporation headquartered in Hershey, PA. Hershey's is the top-selling manufacturer of Chocolate in the United States and accounts for 45 percent of the U.S. Chocolate market. During the Class Period, Hershey's manufactured, marketed, sold and/or distributed Chocolate to customers throughout the United States.

12. Defendant Mars, Inc. ("Mars") is a privately held Delaware corporation with its principal place of business located in McLean, Virginia. During the Class Period, Mars manufactured, marketed, sold and/or distributed Chocolate to customers throughout the United States.

13. Defendant Masterfoods USA, Inc. ("Masterfoods") is a Delaware corporation with its principal place of business located at 295 Brown Street, Elizabethtown, NJ. Masterfoods conducts U.S. food, snack and pet care operations for defendant Mars. During the Class Period, Masterfoods manufactured, marketed, sold and/or distributed Chocolate to customers throughout the United States.

14. Defendant Nestlé S.A. is a Swiss company with its principal place of business located in Vevey, Switzerland. Nestlé S.A. is the world's largest food and beverage company. During the Class Period, Nestlé S.A. manufactured, marketed, sold and/or distributed Chocolate to customers throughout the United States.

15. Defendant Nestlé U.S.A., Inc. ("Nestlé USA") is a Delaware corporation with its principal place of business located at 800 N. Brand Blvd., Glendale, California 91203. Nestlé USA is a wholly owned subsidiary of defendant Nestlé S.A. During the Class Period, Nestlé USA manufactured, sold and distributed Chocolate to customers throughout the United States.

16. Defendants Nestlé S.A. and Nestlé USA are collectively referred to herein as "Nestlé."

17. Defendant Cadbury Schweppes plc ("Cadbury") is an English company with its principal place of business located at Berkeley Square, London, England, U.K. Cadbury sells its

products in the U.S. through a licensing agreement with defendant Hershey's. During the Class Period, Cadbury manufactured, marketed, sold and/or distributed Chocolate to customers throughout the United States.

## DEFENDANTS AND CO-CONSPIRATORS

18. Various other corporations, trade associations, persons and/or entities, not named as Defendants herein, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or deceptive conduct alleged herein. The allegations in this Complaint apply equally to these unnamed co-conspirators.

19. Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

20. Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## INTERSTATE TRADE AND COMMERCE

21. Throughout the Class Period, the Chocolate purchased from Defendants by Plaintiff and the other Class members created a continuous and uninterrupted flow of transactions between Defendants and their customers throughout the United States, including this District. Defendants' unlawful conduct took place within the flow of interstate commerce and affected customers located throughout the United States, including this District, as well as throughout the world. Defendants' unlawful conduct had a direct, substantial, and reasonably foreseeable effect in restraint of trade on both interstate and international commerce.

## CLASS ACTION ALLEGATIONS

22. Plaintiff brings this action on behalf of himself and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following class:

> All persons and/or entities in the United States that purchased Chocolate directly from one or more of the Defendants, any other co-conspirators, or any present or former parent, subsidiary or affiliate of Defendants, at any time during the period from no later than February 2002 to the present. Excluded from the Class are Defendants, their co-conspirators, all present or former parents, predecessors, subsidiaries or affiliates of Defendants, and all governmental entities.

23. This action has been brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

a. The Class is ascertainable and there is a well-defined community of interest among members of the Class;

b. Based upon the nature of trade and commerce involved and the number of purchasers of Chocolate from Defendants and their co-conspirators, Plaintiff believes that the members of the Class number in the thousands, and therefore are sufficiently numerous that joinder of all Class members is not practicable;

c. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Chocolate directly from Defendants or their co-conspirators, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class;

d. The following common questions of law or fact, among others, exist as to the members of the Class:

i. Whether Defendants formed and operated a combination or conspiracy to fix, raise, maintain, and/or stabilize the prices of, or allocate the market for, Chocolate in the United States during the Class Period;

ii. Whether the combination or conspiracy caused prices for Chocolate to be higher than they would have been in the absence of Defendants' conduct;

     iii. The operative time period of Defendants' combination or conspiracy;

     iv. Whether Defendants' conduct caused injury to the business or property of Plaintiff and the members of the Class;

     v. The appropriate measure of the amount of damages suffered by the Class;

     vi. Whether Defendants' conduct violates Section 1 of the Sherman Act;

     vii. Whether Defendants took steps to actively conceal their conspiracy; and

     viii. The appropriate nature of class-wide equitable relief.

  e. These and other questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages;

  f. After determination of the predominant common issues identified above, if necessary or appropriate, the Class can be divided into logical and manageable subclasses;

  g. Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff has no interests that are antagonistic to other members of the Class and has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent him and the Class;

  h. A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical. The damages suffered by the individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent the availability of class action procedures it would not be feasible for Class members to redress the wrongs done to them. Even if the Class members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and the

court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision in a single court;

   i. Defendants have acted, and/or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

   j. In the absence of a class action, Defendants would be unjustly enriched because they would be able to retain the benefits and fruits of its wrongful conduct.

## BACKGROUND

24. Throughout the period covered by this Complaint, Defendants and their co-conspirators engaged in the business of manufacturing, marketing, selling and/or distributing Chocolate throughout the United States.

25. The worldwide market for Chocolate is highly concentrated, with Defendants together controlling almost 50 percent of that market.

26. Defendants' market power in the United States is even greater. Hershey's, Mars and Nestlé control over 80 percent of the Chocolate market in the United States. Defendant Hershey's share is estimated at 45 percent, Defendant Mars's market share is estimated at 27 percent, and Defendant Nestlé's market share is estimated at 9 percent.

27. The high degree of concentration in the market for Chocolate in the United States facilitates the coordination of Chocolate prices.

28. Chocolate is a commodity product that is uniform. It does not vary materially depending upon the manufacturer. The Chocolate produced by any Defendant is fungible with any other Defendant's Chocolate.

29. According to Packaged Facts, an industry publication, the United States market for Chocolate rose to $16 billion in 2006. Much of that increase was achieved through price increases rather than increase unit sales.

30. According to a 2004 market analysis, larger Chocolate producers were able to construct barriers to entry to thwart competition from middle-tier chocolate producers. In 2002,

many Chocolate manufacturers had excess capacity. During the Class Period, Hershey's announced the closure of a number of North American chocolate manufacturing facilities, including in the United States, Ontario, Quebec, and Nova Scotia. On information and belief, closure of those facilities had the effect of restricting the supply of Chocolate in the North American market.

## DEFENDANTS' CONSPIRACY

31. On December 20, 2007, a press release by Defendant Mars indicated that Mars had been contacted by the United States Department of Justice ("DOJ") as part of an inquiry into pricing practices in the chocolate industry. On the same day, Nestlé stated that it was also aware of a DOJ inquiry into United States chocolate marketing practices. The DOJ investigation follows a Canadian Competition Bureau inquiry into allegations of price fixing in the Chocolate market.

32. The Canadian Commissioner of Cooperation became aware of the allegations when a participant in the alleged conspiracy (the "Cooperating Party") approached the Canadian Competition Bureau under its Immunity Program.

33. According to documents unsealed in December, 2007 by the Ontario Superior Court of Justice (East Region), the collusion started in February, 2002, and was initially coordinated by ITWAL, a national Canadian distribution network of wholesale distributors. ITWAL worked with Defendants to force retailers to stop cutting prices for Chocolate. Stores that did not comply had their Chocolate supply cut off.

34. An article in the Wall Street Journal of December 22, 2007, quotes Daniel Wilcock, a lawyer with the Canadian Competition Bureau: "The price fixing communications were often at the most senior levels of the companies involved, and they have continued over a number of years."

35. In one letter from ITWAL to Nestlé, it is stated that, "At the end of the day, it is only the suppliers' control and discipline of the trade spending that can restore the functionality of the marketplace.... I urge you to meet and take action before this chocolate bar 'bubble bursts.'"

36.  One of several TAKE ACTION NOW ("TAN") notices drafted by ITWAL and distributed to members of the alleged cartel attaches pricing information available from diverters, stresses the seriousness of the problems and concludes with, "I trust you will accept the information in the spirit in which it is intended. I look forward to meeting with you to learn what steps [your company] is taking to address this problem."

37.  Another TAN notice dated April 5, 2002 summarizes some of the actions that had been undertaken by the co-conspirators. Among the summarized information is that:

   a. "potential gray marketers have been identified and, in some cases, cut off;"

   b. "part of the solution is that vending customers should not be sold direct and our recommended 'floor price model' will resolve it;"

   c. "an ongoing internal audit procedure has been set up to monitor account activities…some of you have hired a third party investigator with results already being achieved;"

   d. "thank you for your agreement to review;" and

   e. "thank you for putting in writing your serious concerns about this entire situation and the fact that your representatives are subject to immediate termination if trade spending policies are not adhered to accordingly."

38.  A TAN notice dated December 12, 2002 refers to the group's concerted and committed efforts to "clean up" retail trade spending and that this is seen in the reduction of "unreasonably low retail prices."

39.  Allegations in unsealed Canadian documents detail how, in furtherance of the conspiracy, executives of Hershey, Mars, Nestlé and the unnamed Cooperating Party met at coffee shops, restaurants and conventions for the purposes of price-fixing Chocolate in Canada beginning at least as early as February 2002.

40.  On February 23, 2004, an executive from the Cooperating Party met with Bob Leonidas, the Canadian Chief Executive for Nestlé, for a breakfast meeting. At the meeting, one topic of discussion was the reduction of trade spend during which the Cooperating Party

executive indicated that it would reduce trade spend on Chocolate and that Leonidas "sees the world the way" that he does.

41. The Cooperating Party also provided the Bureau with an e-mail exchange beginning on June 1, 2005 related to their discussion with ITWAL. One of these exchanges entitled "Chocolate pricing" stated that ITWAL had informed the recipient that Nestlé and Effem have been hinting to customers about a 2005 price increase and that the Cooperating Party would "seriously consider" appropriate actions when firm details are known. In the same e-mail, the author notes concern over the other leading player not following, but that his contact said that they would inquire about it.

42. During a meeting at the annual Confectionary Manufacturers Association of Canada held on June 2-5, 2005, Bob Leonidas met with an executive of the Cooperating Party and said words to the effect of "[W]e are going to take a price increase and I want you to hear it from the top." Following this exchange, Leonidas handed the other executive an envelope containing information on Nestlé's planned price increase on Chocolate in 2005.

43. By at least July 2005, a letter containing confidential Nestlé price increase information was circulating around the Cooperating Party's office. An e-mail referring to this letter noted that it was a draft, as it was dated July 15, 2005 (the "July 15 letter"), was unsigned and contained spelling mistakes. The information was that Nestlé was increasing the price of its confectionary portfolio by approximately 5-7% effective October 31, 2005 for base confectionary and April 18, 2006 for seasonal confectionary. This pricing information was discussed among the Cooperating Party's leadership team and prompted the Cooperating Party to announce an average price increase of 5.2% on its Chocolate effective October 31, 2005. The Cooperating Party witness admitted that, "[t]he price increase…was such as to align its prices on a number of common formats with those of Nestlé." The witness went on to note that Hershey and Mars quickly followed suit.

44. On July 6, 2005, an assistant to the Cooperating Party's executive was sent by that executive to pick something up from Leonidas. Leonidas met the assistant downstairs at an unspecified Nestlé office and said something to the effect that "it was better not to be seen in his

office." Leonidas then handed over an envelope, again containing information about a planned price increase by Nestlé. Counsel for the Cooperating Party provided the Bureau with a copy of the document that it believed to be the document Leonidas gave to the assistant. The document is an unsigned letter on Nestlé letterhead announcing a chocolate price increase to the trade and was forward-dated July 19, 2005 (the "July 19 letter"). This letter corrects the mistakes in the earlier letter and raises the price increase to between 5 and 8%.

45. According to documents unsealed by the Ontario Superior Court of Justice (East Region), numerous other exchanges took place between Defendants throughout the Class Period that were intended to cause the price of Chocolate to be fixed or stabilized at higher, artificially derived, non-competitive levels.

46. According to news reports, Defendant Cadbury is likely the Cooperating Party given that it is not named as one of the companies under investigation.

47. According to news reports, accusations similar to those made in Canada have been made in the U.S.

48. Defendant Cadbury announced in 2007 that it would increase the prices of Chocolate more than the previous projected price increase of four to six percent and more than the rate of inflation. Cadbury stated the price increase was intended to offset increases in the costs of such raw materials as dairy, oil and cocoa. A Nestlé spokesman also stated in 2007 that surging global commodity costs, including the cost of milk, was responsible for price increases needed to maintain profit margins. In 2007, Hershey increased the price of its Chocolate four to five percent.

## VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

49. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

50. Beginning at a time unknown to Plaintiff, but no later than February 2002, and continuing through the present, Defendants and their co-conspirators entered into a continuing

agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain and/or stabilize the prices for Chocolate paid by Plaintiff and the other Class Members, ostensibly to defray increased raw material costs, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1. Such a contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

51. In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

    a. Agreed to fix, raise, maintain and stabilize the prices of Chocolate charged in the United States and throughout the world;

    b. Announced Chocolate increases and decreases at or near the same times;

    c. Implemented Chocolate price increases and decreases in the same or similar amounts and at or near the same times;

    d. Participated in meetings, phone conferences and other communications to exchange information used by Defendants to formulate and implement the price increases on Chocolate; and

    e. Signaled and communicated the formulation and implementation of the price increases on Chocolate.

52. During the Class Period, the Defendants increased the Chocolate prices they charged. These increases in Chocolate pricing cannot be explained by actual increases in costs or supply/demand forces alone, but rather were the result of anticompetitive conduct.

53. The illegal combination and conspiracy alleged herein has had the following effects, among others:

    a. Price competition in the contracting of Chocolate has been restrained, suppressed and/or eliminated;

     b.     Chocolate prices assessed by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

     c.     Those who purchased Chocolate have been deprived the benefits of free and open competition.

54. During the Class Period, Plaintiff and members of the Class purchased Chocolate directly from one or more Defendants and their co-conspirators.

55. As a direct and proximate result of Defendants' illegal contract, combination and conspiracy, Plaintiff has been injured and will continue to be injured in his business and property by paying more for Chocolate manufactured by the Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

56. Plaintiff and the members of the Class request three times their actual damages that resulted from Defendants' illegal conspiracy to fix the prices for Chocolate. The total amount of damages is presently undetermined.

57. Plaintiff and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## FRAUDULENT CONCEALMENT

58. Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiff and the Class.

59. Plaintiff and the members of the Class did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the antitrust laws as alleged herein until the governmental investigations of their actions were first announced. Nor could Plaintiff and the members of the Class have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. The conspiracy was by its nature self-concealing.

60. Defendants engaged in a successful price-fixing conspiracy with respect to Chocolate, which they affirmatively concealed, in at least the following respects:

    a.    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme; and

    b.    By giving false and pretextual reasons for their Chocolate price increases during the relevant period and by describing such increases falsely as being the result of external costs, namely the rising cost of dairy, oil and cocoa, rather than collusion.

61. As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiff and the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff and the members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.    That the Court adjudge and decree that the unlawful conduct, contract, combination and conspiracy alleged herein constitutes a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Sections 4 and 26 of the Clayton Act;

C.    That judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and the Class he represents for damages as allowed by the Sherman Act, as determined to have been sustained by them, together with costs of suit, including reasonable attorneys' fees;

D.    That Defendants, their co-conspirators, successors, transferees, assigns, parents, subsidiaries, affiliates, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on behalf of Defendants, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of

action, or adopting or following any practice, plan, program or design having a similar purpose or effect in restraining competition;

E. That the Court award Plaintiff and the Class he represents attorneys' fees and costs, and pre-judgment and post-judgment interest as permitted by law; and

F. That the Court award Plaintiff and the Class he represents such other and further relief as may be necessary and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: January 9, 2008        By: *Mario N. Alioto*

Mario N. Alioto (56433)
Lauren C. Russell (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com ;
laurenrussell@tatp.com

Joseph M. Patane (72202)
LAW OFFICES OF JOSEPH M. PATANE
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
E-mail: jpatane@tatp.com

Lawrence G. Papale (67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street #117
St. Helena, CA 94574
Telephone: (707) 963-1704
Facsimile: (707) 963-0706
E-mail: lgpapale@papalelaw.com

Attorneys for Plaintiff Lamson And All Others Similarly Situated